1
2
3
4
5
6
7        IN THE UNITED STATES DISTRICT COURT FOR THE
8              EASTERN DISTRICT OF CALIFORNIA
9

| | |
|---|---|
| 10  WILLIAM J. MOUREN FARMING,     )<br>INC., also known as W J MOUREN )<br>11  FARMING COMPANY,              )<br> )<br>12              Plaintiff,         )<br> )<br>13        v.                       )<br> )<br>14  GREAT AMERICAN INSURANCE,     )<br>COMPANY,                        )<br>15                                )<br>              Defendants.         )<br>16  _____)  | CV F 05-0031 AWI LJO<br><br>ORDER DENYING GREAT<br>AMERICAN'S MOTION FOR<br>SUMMARY JUDGMENT,<br>INJUNCTIVE RELIEF, AND<br>TO ENFORCE THE<br>ARBITRATION AGREEMENT<br><br>(Document #16) |

17
18                        **BACKGROUND**

19       On January 6, 2005, Plaintiff William J. Mouren Farming, Inc. ("MOUREN"), filed a

20  complaint for damages.   MOUREN alleges that it purchased Crop Revenue Coverage ("CRC")

21  insurance from Defendant Great American Insurance Company ("GREAT AMERICAN").

22  MOUREN alleges that its wheat crops in Fresno County and in Kings County, California were

23  destroyed during the 2000 crop year, and GREAT AMERICAN paid MOUREN for MOUREN's

24  losses.   The complaint alleges that GREAT AMERICAN has asserted that it overpaid

25  MOUREN $189,671.00 for MOUREN's Kings County wheat and $285,257.00 for

26  MOUREN's Fresno County wheat.   The complaint alleges an actual controversy now exists

27  between MOUREN and GREAT AMERICAN concerning their respective rights and duties,

28  and MOUREN desires a judicial determination and declaration of MOUREN's and GREAT

AMERICAN's respective rights and duties concerning the dispute.

On February 13, 2005, GREAT AMERICAN filed an answer and counterclaim. The counterclaim alleges that GREAT AMERICAN did not make any of the factual determinations that MOUREN disagrees with and seeks to appeal in the pending arbitration.   GREAT AMERICAN contends that MOUREN has never undertaken an administrative appeal of the RMA's approved APH yield determinations under the appeal provisions found at 7 C.F.R. § 400.56 and 7 C.F.R. Part 400, Subpart J.    The arbitrator in the pending arbitration recently refused to dismiss or limit the scope of the arbitration.  GREAT AMERICAN seeks a declaratory judgment finding: (1) that the scope of the limited arbitration clause does not extend to anything beyond factual determinations that GREAT AMERICAN made; (2) that MOUREN's only remedies as to the RMA's factual determinations is through an appeal under 7 C.F.R. §400.56, 7 C.F.R. Part 400 Subpart J, and 7 C.F.R. Part 11; (3) that MOUREN is bound by the RMA and FCIC's factual determinations, including their APH determinations due to MOUREN's failure to exhaust administrative remedies; (4) that GREAT AMERICAN has satisfied all of its obligations to MOUREN under the policies and that MOUREN is entitled to no further indemnity or relief from GREAT AMERICAN; (5) that GREAT AMERICAN has merely applied the RMA's factual determinations to demand recovery of the overpayment; (6) that MOUREN must repay the overpayment it received; and (7) that MOUREN has no right under the policy terms to avoid collection and repayment of the overpayment through arbitration or any other legal process.  In the alternative, GREAT AMERICAN asks that the court stay the arbitration and order MOUREN to articulate specific factual determinations that GREAT AMERICAN made with which MOUREN disagrees.   GREAT AMERICAN also seeks a money judgment for the overpaid indemnities and underpaid premiums, in the amount of $474,92.00 plus interest.

On April 13, 2005, GREAT AMERICAN filed a motion for summary judgment. GREAT AMERICAN contends that the court must stay and enjoin the pending arbitration because it concerns matters beyond the scope of the parties' arbitration agreement.   GREAT

2

AMERICAN argues that MOUREN has failed to articulate any of GREAT AMERICAN's Factual Determinations with which it disagrees.  GREAT AMERICAN contends that MOUREN is improperly attempting to contest the RMA's determinations in an action against GREAT AMERICAN rather than file an appeal with RMA.   GREAT AMERICAN contends that there is nothing for the arbitrator to determine because the RMA's determinations are binding on MOUREN and MOUREN failed to exhaust timely administrative remedies regarding the RMA's findings.   GREAT AMERICAN contends it is entitled to injunctive relief because the arbitrator has refused to dismiss the arbitration.  GREAT AMERICAN contends that  9 U.S.C. § 4 requires the court to issue an order directing that arbitration cease, or proceed only within its narrow scope.

On May 27, 2005, MOUREN filed an opposition.   MOUREN contends that the RMA's Final Findings are not binding on MOUREN because they were issued to GREAT AMERICA. MOUREN argues that it cannot appeal the RMA's Final Findings because MOUREN never received an adverse finding, and the RMA has told it to arbitrate its dispute with GREAT AMERICAN.

On June 6, 2005, GREAT AMERICAN filed a reply brief.   GREAT AMERICAN contends that the RMA's Final Findings are binding on MOUREN.   GREAT AMERICAN argues that the RMA and the regulations require GREAT AMERICAN to collect the debt from MOUREN.   GREAT AMERICAN contends that the RMA's and National Appeals Division of the Department of Agriculture Hearing Officer's finding that MOUREN cannot appeal the adverse findings are incorrect.

## FACTS

1.    A division of GREAT AMERICAN is engaged in the business of federally-reinsured crop insurance, which is subject to the Federal Crop Insurance Act ("FCIA"), 7 U.S.C. Section 1501, et. seq., and to applicable federal rules and regulations related thereto, including those found at Chapter IV of Title 7 of the Code of Federal Regulations.

3

2.      MOUREN purchased federally-reinsured Crop Revenue Coverage ("CRC") policy

numbers 2000-CA-030-873468 ("873468") and 2000-CA-0303-873475 ("873475")

(hereinafter collectively "the policies") through an insurance agent, the late MICHAEL

IVANS ("IVANS"), from GREAT AMERICAN to cover its 2000 crop year wheat crops

in Kings and Fresno Counties (respectively), California.[1]

3.      The Federal Crop Insurance Corporation ("FCIC") reinsures the policies, and federal law

defines and regulates their terms. FCIC is a federal agency established pursuant to the

Federal Crop Insurance Act ("FCIA") to carry out the purposes of the FCIA.   FCIC

regulates premiums, authors and approves policy terms, defines the rights and obligations

of the insurer and insured, mandates the terms of dispute resolution procedures under

subject policies, and reinsures FCIC created or approved policies issued by private

insurers to farmers.

4.      The United States Department of Agriculture Risk Management Agency ("RMA")

administers FCIC.  For all relevant and practical purposes, the RMA and the FCIC are

one and the same.

5.      Under its rule making authority, the FCIC promulgated rules and regulations setting the

terms of the crop insurance contracts issued by reinsured private companies such as

GREAT AMERICAN.   The terms and conditions preempt any contrary state laws that

would apply to other insurance contracts normally issued by private insurance companies.

6.      MOUREN's policy terms are federal law, which the FCIC promulgated as a final rule in

the Federal Register on November 30, 1999, at 64 Fed.Reg. 66839-66866, pursuant to 7

USC §1508(h). The terms of the rule (and policies) mandate that "This policy is reinsured

by the Federal Crop Insurance Corporation (FCIC) under the authority of section 508(h)

---

[1]  MOUREN does not dispute this fact with the qualification that it is MOUREN's position that at all material times IVANS was GREAT AMERICAN's agent and acted within the scope of his agency and authority.  Because it is not necessary to the resolution of this pending motions to determine whose agent IVANS was, the court will not resolve this dispute.

4

of the Federal Crop Insurance Act, as amended (7 U.S.C. 1508(h)). The provisions of the policy may not be waived or varied in any way by the crop insurance agent or any other agent or employee of FCIC or us."

7.   MOUREN gave IVANS a crop insurance power of attorney that stated MOUREN appointed IVANS as its attorney-in-fact and which authorized him to act on its behalf with respect to crop insurance matters, including but not limited to matters relating to the policies.[2]

8.   To determine the amount of coverage available to an insured farmer, GREAT AMERICAN determines an approved Actual Production History ("APH") yield ("approved APH yield") for the insured crops, which it calculates from Production & Yield Reporting Forms that the insured certifies to it (under penalty of prosecution for false information) to report actual production from prior crop years. The CRC Basic Provisions, at ¶4(e)(1)) mandate that the insured farmer must have "written verifiable records" that support these production reports.

9.   The federal crop insurance "Actual Production History" regulations at 7 C.F.R. Part 400, Subpart G, also govern the approved APH yield process, in furtherance of 7 U.S.C. §1508(g) (which governs "Yield determinations" for APH-based insurance under the Federal Crop Insurance Act).

10.   Under 7 CFR §400.52(e), the "approved APH yield" is "[a] yield, calculated and approved by the verifier, used to determine the production guarantee and determined by the sum of the yearly actual, assigned, and adjusted or unadjusted transitional or determined yields divided by the number of yields contained in the database. The database may contain up to 10 consecutive crop years of actual and or assigned yields. At least four yields will always exist in the database." An insured farmer  submits a

---

[2]   MOUREN states that this fact is undisputed with the qualification that MOUREN gave IVANS the Crop Insurance Power of Attorney at IVANS' request, and IVANS continued to act as GREAT AMERICAN's agent.

"Production Report" to the "Verifier," who calculates the approved APH yield from that report. 7 C.F.R. §400.52(n) requires that the insured's Production Report "must be supported by written verifiable records, … or by other records of production approved by FCIC on an individual basis."

11.    The approved APH yield is used as the basis for calculating the insured farmer's Final Guarantee under the policy.  GREAT AMERICAN must multiply the approved APH yield by the percentage-of-coverage level the insured purchases by the applicable price to determine the Final Guarantee per acre on an insured unit of acreage. To determine whether an insured farmer has a loss under the CRC policy, the insurer compares the Final Guarantee to the farmer's Calculated Revenue (the farmer's actual (or deemed) production multiplied by the Harvest Price), then multiplies any resulting deficit by the insured farmer's ownership share in the insured crops.

12.    As part of the application and underwriting process prior to GREAT AMERICAN's issuance of the policies for crop year 2000, IVANS, acting under his power of attorney as MOUREN's attorney-in-fact, certified MOUREN's production histories to GREAT AMERICAN for MOUREN's Kings and Fresno County wheat crops on Production & Yield Reporting Forms.[3]

13.    GREAT AMERICAN calculated MOUREN's guarantee for each of the policies from the production history information that MOUREN certified through IVANS.

14.    GREAT AMERICAN also calculated MOUREN's premiums for each of the policies from the production history information that MOUREN certified through IVANS, using FCIC's mandated premium rates.

15.    During the 2000 crop year, MOUREN's attorney-in fact, IVANS, submitted notices of

_____

[3]  MOUREN states that this fact is undisputed with the qualification that MOUREN gave IVANS the Crop Insurance Power of Attorney at IVANS' request, and IVANS continued to act as GREAT AMERICAN's agent.

6

1   probable losses under the policies to GREAT AMERICAN.[4]

2   16.   GREAT AMERICAN adjusted MOUREN's reported losses under the policies and

3         determined the amounts of those losses.

4   17.   MOUREN agreed with GREAT AMERICAN's production and loss determinations and

5         signed off on the adjusters' production worksheets in August 2000 to signify its

6         agreement with those determinations.

7   18.   On or about August 22, 2000, GREAT AMERICAN offset the premium and federal

8         administrative fees that MOUREN owed it under the policies, then paid MOUREN a net

9         indemnity payment of $342,122 on policy no. 873468 (Kings County), and a net

10        indemnity payment of $320,326 on policy no. 873475 (Fresno County).

11  19.   Paragraph 4(e) of the CRC Basic Provisions allows GREAT AMERICAN to "revise your

12        [(MOUREN's)] Final Guarantee for any unit, and revise any indemnity paid based on that

13        Final Guarantee, if we find that your production report under paragraph (d) of this

14        section: …(1) Is not supported by written verifiable records…"   While not disputing this

15        fact, MOUREN contends that MOUREN had and continues to have the right to challenge

16        such a revision.

17  20.   On or about July 27, 2001, James S. Anderson of MOUREN gave GREAT AMERICAN

18        a packet of information relating to MOUREN's past production in Kings, Kern and

19        Fresno Counties. The packet included a fire report that indicated that a storage room fire

20        destroyed all of MOUREN's pre-1998 records.

21  21.   MOUREN represented to GREAT AMERICAN that fire had destroyed all of

22        MOUREN's pre-1998 production records for the wheat crops insured under the policies.

23        While admitting this fact, MOUREN states that this admission was based on MOUREN's

24        best knowledge and belief at the time.  MOUREN states that some of the pre-1998

25

26  _____

27        [4] MOUREN states that this fact is undisputed subject to the qualification that IVANS
    was GREAT AMERICAN's agent notwithstanding the Power of Attorney.

28                                              7

1    production records were subsequently discovered by MOUREN.

2    22.    MOUREN later submitted summaries of its production history to GREAT AMERICAN.

3    23.    The RMA sent a compliance investigator to interview MOUREN representatives James

4           S. Anderson and Leland Haun, and also to interview insurance agent IVANS.   The RMA

5           conducted its own independent review of MOUREN's production history records.[5]

6    24.    The RMA requested production records from MOUREN as part of its audit, and it

7           reviewed all records that MOUREN produced to it.

8    25.    The RMA issued Initial Findings to GREAT AMERICAN in relation to each of the

9           policies on or about March 13, 2003.  The RMA determined in those Initial Findings that

10          the production history that IVANS certified on behalf of MOUREN for each of the

11          policies "is not supported by production records as required by regulations."   MOUREN

12          does not dispute that these were the RMA's findings.  However, MOUREN states that the

13          findings were issued to GREAT AMERICAN and not MOUREN.   MOUREN states that

14          the RMA did not inform MOUREN of the results of the RMA's Compliance Audit.

15   26.    The RMA calculated new "approved APH yields" and Final Guarantees under each of

16          MOUREN's policies.

17   27.    The RMA also determined that, since MOUREN's Final Guarantees had dropped,

18          GREAT AMERICAN had overpaid MOUREN by significant amounts as to each policy,

19          and also that GREAT AMERICAN had undercharged premium to MOUREN on each of

20          the policies.

21   28.    On or about April 21, 2003, GREAT AMERICAN notified the RMA that the RMA had

22          made certain math errors in its Final Guarantee and premium calculations in its Initial

23          Findings.

24   29.    The RMA issued its Final Findings (the "Final Findings") as to each of the policies on

25

26   _____

27          [5] This interview and review was within the course of a compliance audit of GREAT
     AMERICAN.

28                                              8

1    May 15, 2003, and corrected the math errors that GREAT AMERICAN had brought to its

2    attention. It transmitted those Final Findings to GREAT AMERICAN.

3    30.    In its Final Findings, the RMA made specific factual determinations with regard to

4    MOUREN's production history records for each county.   The RMA did not inform

5    MOUREN of the results of the Compliance Audit.   The RMA determined the extent to

6    which GREAT AMERICAN was entitled to reinsurance from the RMA.    In particular,

7    the RMA found that:

8          a. for each county, MOUREN's "APH… is not supported by production

9    records as required by regulations;"

10         b. for each county, "the APH certified to [GREAT AMERICAN] is not

11   verifiable due to unacceptable and missing records;"

12         c. for each county, MOUREN's production history for crop years 1993 and

13   1994 that it reported to the USDA Farm Service Agency (FSA) "differed

14   significantly from the yields" MOUREN reported to GREAT AMERICAN for its

15   2000 APH database;

16         d. for each county, MOUREN's own spreadsheets "listing loads of wheat

17   do not support the certified APH;"

18         e. for each county, MOUREN only had actual weight tags for 1998, but

19   not for 1993-1997;

20         f. for each county, MOUREN certified different 1999 production to

21   GREAT AMERICAN than what its 1999 crop insurance carrier had determined

22   for MOUREN's 1999 claim;

23         g. for Kings County (policy 873468), RMA "determined most of the actual

24   weight tags were altered and/or for wheat that is listed as owned by a different

25   insured entity," and that "[m]ost of the weight tags show another insured entity as

26   the owner of the wheat;"

27

28                                          9

h. for Fresno County (policy 873475), RMA "determined all of the actual weight tags lists the wheat as owned by a different insured entity;

i. for both counties, "[n]either [IVANS] nor the insured could provide documentation to support the certified APH;"

j. for both counties, MOUREN's "approved yield should be based upon one year of actual production determined via claim determinations (1999) and three T-yields3 adjusted by 80 percent" (per 7 CFR §400.55(b)(2)).

31.   In making its Final Findings, the RMA applied the APH calculation regulations mandated at 7 C.F.R. Part 400 Subpart G.   MOUREN does not dispute this fact.  Rather, MOUREN argues that the RMA's determination were made to GREAT AMERICAN, not to MOUREN, the determinations were made for reinsurance purposes, the RMA did not issue any adverse decision to MOUREN, the RMA did not inform MOUREN of the result of its Compliance Audit, and MOUREN did not at any time receive any adverse decision by the RMA.

32.   For the Kings County policy no. 873468, RMA calculated that MOUREN's original crop year 2000 "approved yield of 45 bushels per acre is overstated by 22 bushels per acre." The RMA determined and calculated that MOUREN's approved APH yield for Kings County was 23 bushels of wheat per acre for crop year 2000.  The RMA also determined that, as a result of the approved APH yield and Final Guarantee recalculation, GREAT AMERICAN had overpaid MOUREN's indemnity by $167,515, and had undercharged premium by $22,156.  The RMA determined that MOUREN received a net overpayment of $189,671 under policy no. 873468 due to the overstated, unsupported production history that IVANS certified on behalf of MOUREN.[6]

---

[6]  MOUREN does not dispute this fact.  Rather, MOUREN argues that the RMA's determination were made to GREAT AMERICAN, not to MOUREN, the determinations were made for reinsurance purposes, the RMA did not issue any adverse decision to MOUREN, RMA did not inform MOUREN of the result of its Compliance Audit, and MOUREN did not at any time receive any adverse decision by the RMA.

33. For the Fresno County policy no. 873475, the RMA calculated that MOUREN's original crop year 2000 "approved yield of 50 bushels per acre (bu/ac) is overstated by 30 bu/ac." RMA determined and calculated that MOUREN's approved APH yield for Fresno County was 20 bushels of wheat per acre for crop year 2000.   The RMA also determined that, as a result of the approved APH yield and Final Guarantee recalculation, GREAT AMERICAN had overpaid MOUREN's indemnity by $242,177, and had undercharged premium by $43,080.   The RMA determined that MOUREN received a net overpayment of $285,257 under policy no. 873475 due to the overstated, unsupported production history that IVANS certified on behalf of MOUREN.[7]

34. The RMA also initially determined in its Final Findings that IVANS acted as GREAT AMERICAN's agent, not MOUREN's representative, when he certified MOUREN's Production & Yield Reporting Forms to GREAT AMERICAN as part of MOUREN's purchase of the policies. The effect of that determination was to trigger an RMA directive (MGR-88-001) that required GREAT AMERICAN to immediately reimburse FCIC for the federally-reinsured portion of the overpayments and for the understated premium.

35. GREAT AMERICAN appealed that particular aspect of the RMA's May 15, 2003 Final Findings, arguing that IVANS acted under his power of attorney as attorney in-fact for the insured when he made those certifications.   On September 29, 2004, RMA reversed that determination as to IVANS' agency status, informing GREAT AMERICAN in a Final Administrative Determination letter that when IVANS "provided GAIC with the insured's production records, he was acting on the insured's behalf and within the scope

_____

[7]  MOUREN does not dispute this fact.  Rather, MOUREN argues that the RMA's determination were made to GREAT AMERICAN, not to MOUREN, the determinations were made for reinsurance purposes, RMA did not issue any adverse decision to MOUREN, RMA did not inform MOUREN of the result of its Compliance Audit, and MOUREN did not at any time receive any adverse decision by RMA.

11

1   of the authority granted to him under the 1999 Power of Attorney document."[8]

2          Defendant offers as an undisputed fact that IVANS was therefore not acting as

3   GREAT AMERICAN's agent or employee at that time, so GREAT AMERICAN cannot

4   be said to have participated in the attempt to defraud.   MOUREN disputes this fact.   It

5   is not necessary to the resolution of the pending motions to resolve this fact.

6          In the Final Agency Determination, the RMA also permitted GREAT

7   AMERICAN to "postpone making the required payments to FCIC, provided that it makes

8   reasonable efforts to recover the funds from the insured."

9   36.   On January 7, 2004, GREAT AMERICAN sent a letter to MOUREN demanding that it

10         repay the net overpayment and premium debt of $474,928 (hereinafter "the

11         overpayment") to GREAT AMERICAN due to the RMA's findings regarding

12         MOUREN's approved APH yield and the overpayments.

13   37.   MOUREN refused to repay the overpayment to GREAT AMERICAN.

14   38.   MOUREN claimed that it had additional acceptable records (the "new records") that

15         supported its originally- certified production history approved APH yield.  MOUREN

16         disputes this proposed fact to the extent it characterizes the records as "new records."

17   39.   MOUREN had not provided the new records to the RMA at the time the RMA requested

18         records from MOUREN during the RMA's investigation and audit.

19   40.   Also in January 2004, GREAT AMERICAN transmitted copies of the RMA's Final

20         Findings as to each of the two policies to MOUREN.

21   41.   MOUREN and its counsel engaged in a series of correspondence with the RMA

22         personnel and with GREAT AMERICAN's counsel in the ensuing months.

23   42.   On or about April 8, 2004, MOUREN initiated arbitration proceedings with the American

24

25          [8]  MOUREN does not dispute these two sentences.  Rather, MOUREN argues that the
26   RMA's action was directed to GREAT AMERICAN, the RMA did not issue any adverse
     decision to MOUREN, and MOUREN is not bound by any determination the RMA made to
27   GREAT AMERICAN.

28                                         12

Arbitration Association in Fresno, California (AAA Matter No. 74 430 00404 04 SAT), demanding that the arbitrator determine a controversy that MOUREN described in its Demand for Arbitration and an Attachment to Demand for Arbitration as follows:

> Respondent is seeking reimbursement of $474,928.00 from Claimant. Claimant claims that no reimbursement is due to Respondent. … Claimant purchased Crop Revenue Coverage insurance policies from Respondent for the 2000 crop year, one policy for Fresno County and one policy for Kings County. There is a dispute as to Actual Production History ("APH"). Respondent contends that claimant mis-reported its wheat production and acreage history. Claimant denies that it did so. Respondent contends that claimant is obligated to pay Respondent $474,928.00 for indemnity overpayments by Respondent and for premium understatements by claimant. Claimant claims that there was no mis-reporting and that it is not obligated to pay Respondent any sum or sums.

43. Paragraph 20 of the CRC Basic Provisions contains a federally-mandated arbitration agreement, which states:

> **20. Arbitration**
> (a) If you and we fail to agree on any factual determination, the disagreement will be resolved in accordance with the rules of the American Arbitration Association. Failure to agree with any factual determination made by FCIC must be resolved through the FCIC appeal provisions published at 7 CFR part 11. (b) No award determined by arbitration or appeal can exceed the amount of liability established or which should have been established under the policy.

44. Under the terms of Paragraph 20(a) of the CRC Basic Provisions, only a "disagreement" over "any factual determination" is subject to appeal through arbitration.

45. GREAT AMERICAN offers the following undisputed fact:   Also under the terms of Paragraph 20(a) of the CRC Basic Provisions, an insured farmer's disagreement with "any factual determination made by FCIC" is specifically not subject to arbitration, since such a failure to agree "must be resolved through the FCIC appeal provisions published at 7 CFR part 11."   MOUREN does not dispute this fact subject to the qualification that the RMA's determinations were made to GREAT AMERICAN, not to MOUREN; and the RMA did not at any time issue an adverse decision to MOUREN.

46. MOUREN did not initiate an administrative appeal of the RMA's determinations within 30 days after it received notice of those determinations through GREAT AMERICAN.

1    MOUREN does not dispute this fact, but MOUREN claims MOUREN had no appeal

2    rights because RMA did not issue an adverse decision to MOUREN.[9]

3   47.    MOUREN did initiate an administrative appeal of the RMA's failure to respond to

4    MOUREN's request for reconsideration of the Final Findings under 7 C.F.R. Part 11 on

5    or about December 2, 2004. MOUREN did not cite its APH appeal rights under 7 C.F.R.

6    §400.56 and 7 C.F.R. Part 400 Subpart J as a jurisdictional basis for its appeal. The

7    United States Department of Agriculture National Appeals Division ("NAD") Hearing

8    Officer dismissed MOUREN's appeal on jurisdictional grounds in January 2005.

9   48.    The arbitrator in the pending arbitration recently refused to dismiss or limit the scope of

10    the arbitration, finding on January 26, 2005, that GREAT AMERICAN "is making an

11    independent claim [for overpayment recovery] which is apparently based on its adoption

12    of" the RMA Final Findings, and that "there are potential areas of factual disagreement

13    between the parties which fall within the scope of the subject arbitration agreement."

14   49.    GREAT AMERICAN has never agreed or consented to arbitration of anything beyond

15    what the narrow arbitration agreement permits.

16   50.    The second sentence of paragraph 20(a) specifically forbids arbitration of FCIC's

17    determinations ("Failure to agree with any factual determination made by FCIC must be

18    resolved through the FCIC appeal provisions published at 7 CFR part 11.").  MOUREN

19    does not dispute this fact but contends that only a person to whom an adverse

20    determination is issued can appeal.

21                **PLAINTIFF'S ADDITIONAL FACTS**[10]

22   1.    On January 7, 2004, BOB TWOMEY ("TWOMEY"), Great American's Assistant Vice

23

24

25       [9]  MOUREN cites to the Jurisdictional Determination by the National Appeals Division, USDA, dated January 13, 2005.

26       [10]  GREAT AMERICAN does not dispute these facts.   However, GREAT AMERICAN appears to dispute whether some of the statements and conclusions made in this correspondence

27    are correct.

28                        14

President-Claims, wrote to MOUREN regarding "the outstanding / pending Actual Production History ("APH") audit on the above-mentioned [2000 crop year] Crop Revenue Coverage insurance polices."   TWOMEY stated that information furnished by MOUREN had been forwarded by GREAT AMERICAN to the Western Regional Compliance Office ("WRCO") of the RMA "for review and determination as to acceptability under the terms and conditions of the policy."   TWOMEY further stated that because the information was not acceptable, MOUREN had been overpaid by GREAT AMERICAN.  Finally, TWOMEY stated that if MOUREN did not repay the overpayment within thirty days, MOUREN would be ineligible for any program benefits under the Federal Crop Insurance Act.

The letter was the first indication received by MOUREN to the effect that its Final Guarantee had been revised.  The letter did not include copies of the RMA's Final Findings.

2.   On January 13, 2004, TWOMEY again wrote to MOUREN.  TWOMEY stated that the 30-day deadline would be suspended pending submission of new information by MOUREN.   The letter enclosed copies of the RMA's Initial Findings, but not the RMA's Final Findings.   At MOUREN's request, GAIC subsequently furnished MOUREN copies of the Final Findings.

3.   On January 29, 2004, MOUREN's counsel, TED R. FRAME ("FRAME"), wrote to TWOMEY on behalf of MOUREN.  FRAME stated that MOUREN had gathered considerable additional information and that FRAME would like to meet with TWOMEY or a local representative of GREAT AMERICAN to discuss and explain the information.

4.   On February 16, 2004, TWOMEY wrote to FRAME acknowledging receipt of FRAME's January 29, 2004 letter.

5.   On February 17, 2004, FRAME wrote to TWOMEY, stating that he had received eleven binders of documents and a large stack of loose documents from MOUREN, and that he

15

needed to meet with a GREAT AMERICAN representative to "walk" him or her through what he had received.

6.    On February 24, 2004, M. BRADFORD SANDERS, ESQ. ("SANDERS"), counsel for GREAT AMERICAN, wrote to FRAME, stating, in part, that "there would be no point in GREAT AMERICAN's receiving and reviewing the materials you would like to submit for review." Instead, he stated FRAME should submit the materials to the WRCO.

7.    On March 2, 2004, FRAME wrote to SUSAN P. CHOY ("CHOY"), the WRCO Director, stating that he was doing so pursuant to the suggestion by SANDERS that he do so. FRAME requested a meeting with CHOY.

8.    On March 3, 2004, FRAME transmitted a fax memorandum to CHOY correcting a typographical error in his March 2, 2004, letter to her.

9.    Following FRAME's March 2, 2004, letter he talked with CHOY by Telephone. He did so in mid-March 2004, because he had not received a response to his March 2, 2004, letter. She referred him to NANCY KREITZER, ESQ. ("KREITZER"), the Director of the RMA's Appeals, Litigation and Legal Liaison Staff.

10.    FRAME placed several telephone calls to KREITZER but was unable to contact her. Consequently, he wrote to her on April 1, 2004. He communicated by fax with mail confirmation.

11.    KREITZER called FRAME the same day (April 1, 2004) after receiving his fax. She told him that the RMA's role in the matter was that of a reinsurer, that MOUREN's dispute was with GREAT AMERICAN, not with the RMA, and that MOUREN should request arbitration if GREAT AMERICAN was not willing to reconsider the matter.

12.    The following day, April 2, 2004, FRAME received a letter from CHOY by facsimile transmittal. The letter stated the "Producers may request reconsideration from their insurance providers or use the remedies outlined in their policy."

13.    On April 5, 2004, FRAME sent SANDERS a copy of CHOY's letter and stated that since

"Great American acting through you, has rejected our request for reconsideration, we will
proceed to arbitration."

14.   On September 2, 2004, SANDERS wrote to CHOY and stated, among other things, that
the issue was the RMA's not GREAT AMERICAN's.

15.   On September 21, 2004, the RMA responded to SANDERS' letter, and on October 13,
2004, SANDERS' responded to the RMA's September 21, 2004, letter.

16.   On or about December 2, 2004, MOUREN filed with the National Appeals Division of
the United States Department of Agriculture a Request For Review of Failure by the
RMA To Grant Reconsideration Of Findings Made By It, requesting the National
Appeals Division to direct the RMA to act within a reasonable time to permit
reconsideration by it of its Final Findings.

17.   On January 6, 2005, the present action was filed.

18.   On January 13, 2005, the National Appeals Division issued the Jurisdictional
Determination previously referred to.

19.   On January 26, 2005, the Arbitrator issued the order previously referred to.

## DISCUSSION

The parties agree that the CRC insurance at issue is a specialized type of federally
regulated and subsidized insurance available to farmers pursuant to the Federal Crop Insurance
Act of 1938 ("FCIA").  See 7 U.S.C. § 1501, et seq.  Pursuant to 7 U.S.C. § 1507(c), the Federal
Crop Insurance Corporation ("FCIC"), administered by the Risk Management Agency ("RMA"),
makes CRC policies available to a reinsuring private insurer that issues the insurance policy in
the insurer's name.  FCIC approves the policy language in such polices and establishes its
premiums, terms and conditions.  See 7 U.S.C. § 1508.  In this action, the parties agree that
GREAT AMERICAN is a reinsuring private insurer[11] that sold CRC insurance to MOUREN.

---

[11]  The regulations use the terms "reinsuring private insurer," "approved insurance
providers," and  "company" to describe insurance companies such as GREAT AMERICAN.

17

Federal law has long recognized that the terms and conditions of a federal insurance policy must be strictly complied with.  See Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384-85 (1947); Flick v. Liberty Mut. Fire Ins. Co., 205 F.3d 386, 390 (9th Cir. 2000).  The court has a duty to "observe the conditions defined by Congress for charging the public treasury," and must remember that "not even the temptations of a hard case" can provide a basis for a recovery that is contrary to federal regulations.  Merrill, 332 U.S. at 385-86; Flick, 205 f.3d at 390.  For example, in Merrill the Supreme Court found that a group of farmers could not recover for crop losses under a federal crop insurance policy because their claims did not comply with the terms and conditions for coverage set forth in the Wheat Regulations.  Merrill, 332 U.S. at 385.    The statements of an insurance company employee cannot be applied to extend coverage where there is none because the doctrine of estoppel cannot extend coverage beyond that authorized by the policy. Mann v. Federal Crop Ins. Corp., 710 F.2d 144, 147 (4th Cir. 1983); Walpole v. Great American Insurance Companies, 914 F.Supp. 1283, 1290 (D.S.C. 1994).

**MOTION FOR INJUNCTIVE RELIEF**

**A.  Legal Standard**

The legal principles applicable to a request for preliminary injunctive relief are well established.  To prevail, the moving party must show either: "(1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor." Walczak v. EPL Prolong, Inc., 198 F.3d 725, 731 (9th Cir.1999); Oakland Tribune, Inc. v. Chronicle Publishing Company, Inc., 762 F.2d 1374, 1376 (9th Cir. 1985).  The two formulations represent two points on a sliding scale with the focal point being the degree of irreparable injury shown.  Walczak, 198 F.3d at 731;  Oakland Tribune, 762 F.2d at 1376.  The greater the relative hardship to [a plaintiff], the less probability of success must be shown.  Walczak, 198 F.3d at 731.  "Under either formulation of the test, the plaintiff must demonstrate that there exists a significant threat of

irreparable injury." <u>Oakland Tribune</u>, 762 F.2d at 1376.  In the absence of a significant showing

of irreparability, the court need not reach the issue of likelihood of success on the merits.  <u>Id</u>.

**B.  DISCUSSION**

GREAT AMERICAN contends that the court must stay and enjoin the arbitration because

it concerns matters beyond the parties' arbitration agreement.   The arbitrator has refused to

dismiss MOUREN's arbitration.   GREAT AMERICAN contends that an injunction is necessary

to prevent irreparable harm and to maintain the status quo.   GREAT AMERICAN contends that

MOUREN is seeking to arbitrate the RMA's factual determinations and these factual

determinations are not subject to arbitration.

The parties agree that Paragraph 20 of the CRC Basic Provisions contains the following

arbitration agreement, which states:

> **20. Arbitration**
> (a) If you and we fail to agree on any factual determination, the disagreement
> will be resolved in accordance with the rules of the American Arbitration
> Association. Failure to agree with any factual determination made by FCIC must
> be resolved through the FCIC appeal provisions published at 7 CFR part 11. (b)
> No award determined by arbitration or appeal can exceed the amount of liability
> established or which should have been established under the policy.

Under the terms of Paragraph 20(a) of the CRC Basic Provisions, only a "disagreement" over

"any factual determination" is subject to appeal through arbitration.   Paragraph 20(a) also

requires factual findings made by the FCIC be appealed to the FCIC, and these factual findings

are not subject to arbitration.    The parties disagree whether this provision applies to factual

findings made by the RMA on behalf of the FCIC that were directed to GREAT AMERICAN.

***1.  Factual Findings***

GREAT AMERICAN contends that the court must enjoin the arbitration because there

are no factual findings at issue.   An agreement to arbitrate is a contract to resolve only those

disputes that the parties have agreed to submit to arbitration.  <u>See</u> <u>First Options of Chicago, Inc.</u>

<u>v. Kaplan</u>, 514 U.S. 938, 943 (1995).  An arbitrator's scope of authority is defined by the parties'

contractual agreement to arbitrate and by the issues actually submitted for determination.

1   <u>Michigan Mut. Ins. Co. v. Unigard Sec. Ins. Co.</u>, 44 F.3d 826, 830 (9th Cir.1995) ("When

2   arbitrators rule on a matter not submitted to them, or act outside the scope of the parties'

3   contractual agreement, the award may be overturned because the arbitrators exceeded the scope

4   of their authority.").

5        MOUREN has submitted several factual issues in dispute.   MOUREN contends that the

6   APH is a factual question based on such factual issues as the insured's production history and

7   whether the insured's records are accurate.   MOUREN also contends that there are factual

8   disputes regarding weight tags.   Finally, there appear to be factual questions on whether

9   GREAT AMERICAN accepted the Final Findings without allowing MOUREN the opportunity

10  to provide further information, raising a question on whether GREAT AMERICAN is correct to

11  require MOUREN to return money.   The court finds that these are factual disputes between the

12  parties.   GREAT AMERICAN has adopted the Final Findings of the RMA and is requesting

13  MOUREN return to GREAT AMERICAN the funds the RMA has ordered GREAT

14  AMERICAN to return to the RMA.   Whether GREAT AMERICAN was correct to adopt the

15  RMA's Final Findings and require MOUREN to return the funds is a factual dispute between

16  GREAT AMERICAN and MOUREN.  Thus, the arbitration will not be enjoined on the ground

17  that MOUREN has not listed any factual disputes.

18  ***2.  Appeal to the RMA***

19       GREAT AMERICAN contends that the arbitration must be stopped and there is nothing

20  to arbitrate because the RMA's findings are final and if MOUREN is unhappy with these

21  findings, MOUREN must appeal to the RMA not GREAT AMERICAN.   GREAT

22  AMERICAN's basic position throughout its brief is that MOUREN's dispute is with the RMA

23  and not GREAT AMERICAN.   GREAT AMERICAN essentially contends that it has been

24  caught in the middle and should not be forced to accept the RMA's findings in one proceeding

25  and then be subject to possibly conflicting findings in an arbitration between MOUREN and

26  GREAT AMERICAN.

27

28                                          20

1    Because the RMA made the underlying determinations that are adverse to MOUREN, the

2    court is not unsympathetic towards GREAT AMERICAN's basic argument that MOUREN and

3    the RMA should resolve this dispute among themselves.   However, given that MOUREN has no

4    ability to challenge the RMA's findings with the RMA, MOUREN's only forum to present its

5    position and evidence is an arbitration between MOUREN and GREAT AMERICAN.    And, if

6    MOUREN is successful at the arbitration, then GREAT AMERICAN may have available

7    remedies to pursue with the RMA.  While it might be simpler to merely have MOUREN and the

8    RMA resolve the dispute, MOUREN and the RMA have no contractual obligations between

9    them and the RMA has issued no decision adverse to MOUREN that MOUREN can appeal.

10    Subpart J of Title 7, Part 400 of the Code of Federal Regulations pertains to appeals.

11    Section 400.91 provides:

12    a) This subpart applies to:
     (1) Adverse decisions made by personnel of the Agency with respect to:

13    (i) Contracts of insurance insured by FCIC; and
     (ii) Contracts of insurance of private insurance companies and reinsured by FCIC

14    under the provisions of the Act.
     (2) Determinations of good farming practices made by personnel of the Agency or

15    the reinsured company (see § 400.98).
     (b) This subpart is not applicable to any decision:

16    (1) Made by the Agency with respect to any matter arising under the terms of the
     Standard Reinsurance Agreement with the reinsured company; or

17    (2) Made by any private insurance company with respect to any contract of
     insurance issued to any producer by the private insurance company and reinsured

18    by FCIC under the provisions of the Act, except for determinations of good
     farming practices specified in § 400.91(a)(2).

19    (c) With respect to matters identified in § 400.91(a)(1), participants may request
     an administrative review, mediation, or appeal of adverse decisions by the Agency

20    made with respect to:
     (1) Denial of participation in the crop insurance program;

21    (2) Compliance with terms and conditions of insurance;
     (3) Issuance of payments or other program benefits to a participant in the crop

22    insurance program; and
     (4) Issuance of payments or other benefits to an individual or entity who is not a

23    participant in the crop insurance program.
     (d) Only a participant may seek an administrative review or mediation under this

24    subpart, as applicable.

25    A participant may appeal an adverse decision made by personnel of the Agency with respect to

26    contracts of insurance of private insurance companies and reinsured by FCIC.    However, the

27

28                                          21

court is not persuaded that the RMA's Final Findings fall under this provision.    An adverse

decision is defined as a decision by an employee or Director of the Agency that is adverse to the

participant.  7 C.F.R. § 400.90.    Here, each of the RMA's directives were given to GREAT

AMERICAN, not MOUREN.    The May 15, 2003 Final Findings stated that "the Company

remains indebted for the amounts shown above."  See G.A. Counsel Dec. Ex. 3 & Ex. 4.    Both

the March 13, 2003 Initial Findings and the July 1, 2003 Final Findings were issued to GREAT

AMERICAN.    There is no evidence or argument that the RMA served these findings on

MOUREN and/or give MOUREN the opportunity to respond to the Initial Findings or provide

additional records before issuing a final decision.  While MOUREN was contacted regarding the

audit and required to turn over records, MOUREN did not have the opportunity to make any

objections to the RMA's Initial Findings and fully participate in the process.

The RMA's decision in this case was issued against GREAT AMERICAN.    The RMA

was conducting an audit of GREAT AMERICAN, not MOUREN.    The RMA appears to have

been making a finding adverse to GREAT AMERICAN in connection with the RMA's

agreement to GREAT AMERICAN to reinsure GREAT AMERICAN.    Section 400.91 does not

apply to any decision made by the Agency with respect to any matter arising under the terms of

the Standard Reinsurance Agreement with the reinsured company.    Thus, the court finds the

RMA has issued no final findings that MOUREN can appeal.

GREAT AMERICAN cites to the RMA's September 29, 2004 letter as evidence that the

RMA has directed its findings to MOUREN.  In this letter the RMA directed GREAT

AMERICAN to make reasonable efforts to recover the overpaid funds from MOUREN.   The

September 29, 2004 letter concerns Bulletin No.: MCR-001, dated January 15, 1988, which

allows a company such as GREAT AMERICAN to postpone making required payments to FCIC

until after it recovers those amounts from the insured.  See G. A. Counsel Dec. Ex. 8.  In its

September 29, 2004, letter the RMA concluded that IVANS was not acting as GREAT

AMERICAN's agent, but was acting under MOUREN's power of attorney.  As such, the RMA

1  concluded that GREAT AMERICAN could not be said to have participated in the attempt to

2  defraud.    Thus, the RMA concluded: "Pursuant to the Bulletin, GAIC may postpone making the

3  required payments to FCIC, provided that it makes reasonable efforts to recover the funds from

4  the insured."    Bulletin No.: MGR-04-011 is dated October 6, 2004 and replaces MCR-001.  See

5  G.A. Counsel Dec. Ex. 9.   This bulletin reinforces that to qualify for relief, a reinsured company

6  must make reasonable efforts to collect the debt.   See id.

7         The court finds that the fact that the RMA has made a finding that GREAT AMERICAN

8  can postpone payment to the RMA but to qualify GREAT AMERICAN must make reasonable

9  efforts to collect from MOUREN does not turn the RMA's findings into an adverse decision

10  against MOUREN.   There is no evidence that MOUREN was given any notice or opportunity to

11  address the issue of responsibility for the error.   MOUREN was not given any opportunity to

12  address the issue of IVANS' agency with the RMA.  The RMA's decision was addressed to

13  GREAT AMERICAN and concerned whether GREAT AMERICAN could postpone its

14  payments to the RMA.   The RMA itself has not directed or ordered MOUREN to repay the

15  funds.   The Bulletin allowing GREAT AMERICAN to postpone its payments provides guidance

16  on whether the RMA's findings on the applicability of the Bulletin is a directive to the insureds.

17  MCR-04-011 states that "Recovery of the overpaid indemnity or understated premium is the

18  responsibility of the company since the debt arises from a contract between the reinsured

19  company and its policyholder."   See G.A. Counsel Dec. Ex. 12.  Thus, the court does not find

20  that the RMA's finding that GREAT AMERICAN can delay its payments is a final finding by

21  the RMA directed to MOUREN that MOUREN must either accept or appeal pursuant to Subpart

22  J of Part 400 of Title 7 of the Code of Federal Regulations.

23         GREAT AMERICAN also contends that MOUREN could have appealed the RMA's

24  findings because in issuing its Final Findings, the RMA adjusted MOUREN's Actual Production

25  History ("APH").   GREAT AMERICAN points out that 7 C.F.R. § 400.56 allows an insured to

26  appeal the approved APH yield in accordance with the procedures contained in 7 C.F.R. Part

27

28                                                       23

400, Subpart J.   Thus, GREAT AMERICAN takes the position that MOUREN can still appeal

pursuant to 7 C.F.R. § 400.56.   The approved APH yield is "a yield, calculated and approved by

the verifier, used to determine the production guarantee and determined by the sum of the yearly

actual, assigned, and adjusted or unadjusted transitional or determined yields divided by the

number of yields contained in the database."   7 C.F.R. § 400.52(e)   The insured is required to

provide certified production reports to the crop insurance agent to determine the APH.  7 C.F.R.

§ 400.53.   The insured is responsible for timely submission and certification of accurate and

complete production reports and the insured must provide the reports to FCIC upon request. 7

C.F.R. § 400.54.   Using the production reports, the verifier will determine if the production

reports are acceptable and calculate the approved APH.  7 C.F.R. § 400.54(d).   The verifier is

defined as: "A person authorized by the FCIC to calculate approved APH yields."

         In this case, the verifier was GREAT AMERICAN when it established the original APH.

In its Final Findings, the RMA determined that the APH certified by Ivans was not supported by

production records as required by regulations.  See G.A. Counsel Dec. Ex. 3 & 4.   However, the

RMA did not calculate a new APH for the purpose of insuring MOUREN.  See id.  Rather, the

RMA determined that it had made an indemnity overpayment of $167,515 and a premium

understatement of $22,156.  See id.   In making this finding, the RMA found that the approved

yield overstated the bushels per acre.   See id.   While the RMA did calculate a new approved

APH yield, this determination was not directed at MOUREN.   The RMA's determination was

only directed at RMA's indemnification to GREAT AMERICAN.    The appellate rights given in

7 C.F.R. § 400.56 pertain to approved APH yields calculated by GREAT AMERICAN and not

indemnification findings made by the RMA.

         As further support for the proposition that MOUREN's remedy is through arbitration and

not an appeal with the RMA is the fact that the RMA has taken this exact position.    In the

RMA's January 6, 2005 letter to the hearing officer, the RMA stated:

         The agency did not issue an adverse decision to the above listed policy holder.
         The agency merely advised the policyholder's insurance company that the

company overpaid a crop insurance indemnity and that reinsurance would not be paid to the insurance company.

RMA's compliance findings were issued to the insurance company and such findings are issued for the purpose of reinsurance determinations . . . . The insurance company is obligated to make its own independent decisions on whether payments are made to insureds under the terms of the policy.

See Mouren Counsel Dec. Ex. Q.   The letter concludes by stating that MOUREN's "rights are described in the insurance policy and essentially provide for arbitration or legal action within one year of the date of the insurance company's adverse determination." See id.   On January 13, 2005, the Hearing Officer for the National Appeals Division of the Department of Agriculture found that MOUREN's appeal to the RMA must be dismissed because MOUREN could not file an appeal.   See Mouren Counsel Dec. Ex. R.   The Hearing Officer found that MOUREN could not appeal because MOUREN did not receive an adverse decision from a USDA agency.   See id.

When a case involves an administrative agency's construction of a statute that it administers, the court's analysis is governed by Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).   Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132 (2000).   Under the Chevron framework, a reviewing court first determines if "Congress has directly spoken to the precise question at issue,' in such a way that 'the intent of Congress is clear." Chevron, 467 U.S. at 842. If the statute is silent or ambiguous, the court decides whether the agency's interpretation "is based on a permissible construction of the statute." Chevron, 467 U.S. at 843.   When an agency's interpretation is reasonable, it must prevail, even if there is another interpretation that is consistent with the statute.   Hawaii ex. rel. Atty. Gen. v. Federal Emergency Management Agency, 294 F.3d 1152, 1159 (9th Cir.2002).  The court is not bound to an agency interpretation that is "procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." United States v. Mead Corp., 533 U.S. 218, 227 (2001).

Interpretations, such as those in opinion letters, policy statements, agency manuals, and enforcement guidelines, lack the force of law and do not warrant Chevron style deference.

Christensen v. Harris County, 529 U.S. 576, 587 (2000).   These agency interpretations are only entitled to "some deference," as opposed to the rigorous deference owed formal agency interpretations under Chevron.   Id.

In this case, the various letters MOUREN has provided and discussed in MOUREN's statement of disputed facts, written by the RMA regarding this issue, would be similar to opinion letters.   The RMA's position is only entitled to some deference.   However, the National Appeals Division opinion, finding the RMA issued no opinion as to MOUREN and dismissing MOUREN's appeal for lack of jurisdiction, appears to be a final agency decision entitled to Chevron difference.[12]   Regardless, under either standard, the court finds the RMA's position reasonable and for the reasons stated above agrees with it.   The final decision at issue concerned the RMA's and GREAT AMERICAN's indemnification contract.   MOUREN was given limited ability to provide evidence and participate in the process.   Requiring MOUREN to address its position and provide its evidence in an appeal, when MOUREN was not part of the informal decision and final decision would require the National Appeal Division to consider evidence and arguments not made to the RMA.   It is not unreasonable for the National Appeals Division for the Department of Agriculture to determine that the appeal should be limited to the arguments and evidence considered during the RMA's audit.   Given that MOUREN and the RMA did not deal directly with each other and GREAT AMERICAN is the only party with a contract with both MOUREN and the RMA, requiring GREAT AMERICAN to deal separately with the RMA and with MOUREN is reasonable.   Thus, the court finds that the agency's opinions and decision on this issue support this court's conclusion that MOUREN is not required to appeal the RMA's Final Findings.

As stated above, the court is not unsympathetic to GREAT AMERICAN's position.

---

[12]   GREAT AMERICAN claims that it would be unfair to bind it to a decision that resulted from litigation between RMA and MOUREN.   Ironically, that is exactly the position GREAT AMERICAN has taken concerning the audit between RMA and GREAT AMERICAN. GREAT AMERICAN believes that MOUREN should be bound to the decision even though it was not given the opportunity to fully participate in the process.

Because GREAT AMERICAN is operating as a "middle man" it makes some amount of sense

for MOUREN and the RMA resolve this dispute between themselves.   However, the RMA

chose to audit GREAT AMERICAN and reduce its indemnity to GREAT AMERICAN.   While

GREAT AMERICA has been given the opportunity to collect the overpayment from MOUREN

and must make reasonable efforts to collect this money, the RMA never ordered GREAT

AMERICAN to collect the funds.   GREAT AMERICAN could have repaid the funds to RMA,

as it was originally ordered to do, and not asked for time to collect the funds from MOUREN.

Given the nature of CRC insurance and the reinsurance program set in place by the statutes and

regulations and in the absence of any authority to the contrary, the court finds forcing MOUREN

to appeal a decision not directed at it and that the agency refuses to hear is not required.   Thus,

the court declines to enter an injunction stopping the arbitration on the ground that MOUREN

must administratively appeal the adverse findings.

### *3.  New Records*

_____GREAT AMERICAN contends that another reason the court must enjoin the arbitration

is because MOUREN claims to have new records it intends to use during the arbitration even

though they were not provided at the time of the audit.   The parties have submitted evidence

showing that a motion in limine concerning these new records is pending before the arbitrator.

The court finds that the possibility the arbitrator may make an incorrect decision regarding

evidence is not grounds to stop the arbitration.   By agreeing to arbitration in the CRC policy,

GREAT AMERICAN agreed to be subjected to the arbitrator's evidentiary rulings.   The court

has no reason to believe that the arbitrator will not consider the relevant law, MOUREN's ability

to present evidence during the audit, the possible unfairness to GREAT AMERICAN in having

inconsistent decisions based on different evidence, and any other equities in deciding what

evidence to consider and rendering his decision.   Thus, the court will not enjoin the arbitration

on the ground that the arbitrator may consider evidence not considered during the RMA's audit.

//

**MOTION TO ENFORCE TERMS OF ARBITRATION AGREEMENT**

**A.  Legal Standard**

The Federal Arbitration Act ("FAA") creates "a body of federal substantive law of arbitrability," enforceable in both state and federal courts.  Moses H. Cone Mem. Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24, (1983);  Cohen v. Wedbush, Noble, Cooke, Inc., 841 F.2d 282, 285 (1988).   The FAA reflects "Congress' intent to provide for the enforcement of arbitration agreements within the full reach of the Commerce Clause."  Perry v. Thomas, 482 U.S. 483, 490 (1987); Republic of Nicaragua v. Standard Fruit Co., 937 F.2d 469, 475 (9th Cir 1991).    The FAA allows a federal district court to enforce arbitration agreements. Shearson/American Exp., Inc. v. McMahon, 482 U.S. 220, 226 (1987).   Section 4 of the FAA permits "a party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition any United States District Court . . . for an order directing that . . . arbitration proceed in the manner provided for in [the arbitration] agreement." 9 U.S.C. § 4.  Any question concerning arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.  Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 719 (9th Cir. 1999).  The FAA establishes that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability. Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. at 24; Simula, Inc.,175 F.3d at 719; Wolsey, Ltd. v. Foodmaker, Inc., 144 F.3d 1205, 1209 (9th Cir.1998).

**B.  Discussion**

GREAT AMERICAN contends that the court must stop the arbitration pursuant to 9 U.S.C. § 4.   GREAT AMERICAN contends MOUREN is attempting to arbitrate matters that are excluded from arbitration.   For the reasons discussed above, the court finds that MOUREN can proceed with the arbitration.    Factual issues, such as the appropriate APH and whether GREAT AMERICAN is correct in holding MOUREN responsible for the error, are in dispute between

1   MOUREN and GREAT AMERICAN.   The court has confidence that to the extent the

2   arbitrator's findings may differ from those of RMA, the arbitrator will give appropriate

3   consideration to the equities at issue.   Thus, the court declines to stop the arbitration pursuant to

4   9 U.S.C. § 4.

5

6                          **MOTION FOR SUMMARY JUDGMENT**

7   **A.  Legal Standard**

8                                **LEGAL STANDARD**

9           Summary judgment is appropriate when it is demonstrated that there exists no genuine

10   issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

11   Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Poller v.

12   Columbia Broadcast System, 368 U.S. 464, 467 (1962); Jung v. FMC Corp., 755 F.2d 708, 710

13   (9th Cir. 1985); Loehr v. Ventura County Community College Dist., 743 F.2d 1310, 1313 (9th

14   Cir. 1984).

15           Under summary judgment practice, the moving party always bears the initial
            responsibility of informing the district court of the basis for its motion, and
16           identifying those portions of "the pleadings, depositions, answers to
            interrogatories, and admissions on file, together with the affidavits, if any," which
17           it believes demonstrate the absence of a genuine issue of material fact.

18   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

19           When the moving party has the burden of proof at trial, that party must carry its initial

20   burden at summary judgment by presenting evidence affirmatively showing, for all essential

21   elements of its case, that no reasonable jury could find for the non-moving party. United States v.

22   Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir.1991) (en banc); Calderone v.

23   United States, 799 F.2d 254, 259 (6th Cir. 1986); see also E.E.O.C. v. Union Independiente De La

24   Autoridad De Acueductos Y Alcantarillados De Puerto Rico, 279 F.3d 49, 55 (1st Cir. 2002)

25   (stating that if "party moving for summary judgment bears the burden of proof on an issue, he

26   cannot prevail unless the evidence that he provides on that issue is conclusive.")

27

28                                          29

Where the nonmoving party will bear the burden of proof at trial, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322-23.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280 (9th Cir. 1979).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Anderson, 477 U.S. 248-49; Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56(c); Poller, 368 U.S. at 468; SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th

Cir. 1982).  The evidence of the opposing party is to be believed, <u>Anderson</u>, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, <u>Matsushita</u>, 475 U.S. at 587 (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962)(per curiam); <u>Abramson v. University of Hawaii</u>, 594 F.2d 202, 208 (9th Cir. 1979).

If a motion for summary judgment calls for the court to apply law to undisputed facts, it is a mixed question of law and fact.  <u>HIH Marine Insurance Services, Inc. v. Virgin Atlantic Airways</u>, 105 F.Supp.2d 1083, 1091 (N.D. Cal. 2000).  A mixed question of fact and law occurs when the facts are undisputed, the relevant law is accepted, and the issue for the court is whether the facts satisfy the legal rule.  <u>Pullman-Standard v. Swint</u>, 456 U.S. 273, 289 n. 19 (1982).  "When a mixed question of fact and law involves undisputed underlying facts, summary judgment is appropriately granted."  <u>Han v. Mobil Oil Corp.</u>, 73 F.3d 872, 874 (9th Cir.1995); <u>In re Software Toolworkers, Inc</u>, 789 F.Supp. 1489, 1495 (N.D. Cal. 1992).  Thus, where the case turns on a mixed question of fact and law and the only dispute relates to the legal significance of the undisputed facts, the controversy for trial collapses into a question of law suitable for disposition on summary judgment.  <u>See</u> <u>Union Sch. Dist. v. Smith</u>, 15 F.3d 1519, 1523 (9th Cir.1994); <u>Graham v. City of Chicago</u>, 828 F.Supp. 576, 583 (N.D.Ill.1993).  Finally, if a motion for summary judgment questions only issues of law, the resolution of which does not involve disputed material facts, summary judgment is also appropriate.  <u>Delbon Radiology v. Turlock Diagnostic Center</u>, 839 F.Supp. 1388, 1391 (E.D. Cal. 1993).

**B.  DISCUSSION**

***1.  MOUREN's Declaratory Judgment Claim***

GREAT AMERICAN contends that it is entitled to summary judgment on MOUREN's complaint because MOUREN failed to comply with paragraph 25(a) of the CRC before filing suit.  GREAT AMERICAN contends that MOUREN failed to complete arbitration with GREAT AMERICAN over any factual determinations before the statute of limitations ran and prior to

1   commencing suit against GREAT AMERICAN.

2       The parties agree that section 25 of the CRC policy mandates that legal action be brought

3   within twelve months of the date of the denial of the claim in accordance with the provision of 7

4   U.S.C. § 1508(j).   The parties agree that on January 7, 2004, GREAT AMERICAN first demand

5   the overpayment of $474.928.   The parties agree that on April 8, 2004, MOUREN initiated

6   arbitration proceedings.   The parties agree this action was filed on January 6, 2005.

7       The court finds that "legal action" incorporates both arbitration and lawsuits.   If legal

8   action included only lawsuits, the CRC policy would have read "lawsuit" or "suit" instead of

9   "legal action."   Further, section 20 of the policy requires any disagreements on factual

10  determinations be resolved by arbitration.   Depending on the nature of the dispute, arbitration

11  might have to happen before a lawsuit and/or a lawsuit may be unnecessary to resolve the

12  dispute.   If factual disputes have to be decided first, it would be unreasonable to have "legal

13  action" not include an arbitration because the arbitration process might take longer than a year,

14  making any lawsuit barred by the limitations period.   If the only dispute was a factual dispute,

15  making any lawsuit unnecessary, it would be inconsistent to require a limitations period for a

16  lawsuit but not for an arbitration, allowing an arbitration to proceed years after a denial.   Finding

17  "legal action" refers to both an arbitration and lawsuit is supported by the Final Agency

18  Determination of the RMA that also found "legal action" encompasses both arbitrations and

19  lawsuits.   See G.A. Counsel Dec. Ex. 6.   Because both the demand for arbitration and this action

20  were filed within one year of GREAT AMERICAN's demand for overpayment from MOUREN,

21  MOUREN's declaratory relief claim is not subject to dismissal because MOUREN violated the

22  limitations period.

23      GREAT AMERICAN appears to take the position that the arbitration must have been

24  completed before this action was filed.   The court finds insufficient support for this position.

25  The policy requires all legal action, including a lawsuit, be filed within one year.   Requiring no

26  lawsuit to be filed until the arbitration is completed could bar the lawsuit.   MOUREN should not

27

28                                         32

be barred from filing an action merely because an arbitration takes more than one year. MOUREN would not have complete control over how long an arbitration would take, and a party seeking to avoid the jurisdiction of this court should not be able to avoid a lawsuit by stretching out an arbitration.   There is no indication whether a timely filed arbitration would toll the limitation period for any lawsuit.  Thus, it was not unreasonable for MOUREN to believe it also needed to file a lawsuit before the one year period expired.   Such a lawsuit could be stayed pending the arbitration.   Accordingly, GREAT AMERICAN is not entitled to summary judgment on the ground that the arbitration was not over at the time MOUREN filed this lawsuit.

GREAT AMERICAN also contends that MOUREN failed to appeal the RMA's factual determinations through the FCIC appeal provisions prior to filing suit.   As discussed above, there were no factual disputes that MOUREN could have appealed to the RMA.  Thus, GREAT AMERICAN is not entitled to summary judgment on the ground that MOUREN failed to comply with the CRC and appeal factual decisions through the FCIC before filing suit.

## 2.  GREAT AMERICAN's Counterclaim for $474,928

GREAT AMERICAN contends that it is entitled to summary judgment on the funds GREAT AMERICAN seeks.   GREAT AMERICAN argues that summary judgment is appropriate because the RMA's Final Findings are binding upon MOUREN.   For the reasons discussed above, the court finds that the RMA's Final Findings are not necessarily binding upon MOUREN.   The RMA did not issue a final decision as to MOUREN.   MOUREN remains free to arbitrate and litigate, as allowed by the CRC policy, whether GREAT AMERICAN is correctly seeking the payment of $474,928 from MOUREN.


**ORDER**

Accordingly, for the reasons stated in the above memorandum opinion and order, the court ORDERS that:

1.    GREAT AMERICAN's motion for an injunction is DENIED;


33

1  2.    GREAT AMERICAN's motion to stop the pending arbitration is DENIED;

2  3.    GREAT AMERICAN's motion for summary judgment is DENIED; and

3  4.    The parties are DIRECTED to submit status reports, or a proposed stipulation, within

4        twenty days of this order's date of service indicating the parties' position on whether this

5        action should be stayed pending the arbitration.

6

7   IT IS SO ORDERED.

8  **Dated:    August 24, 2005    **                        _____/s/ Anthony W. Ishii_____
   0m8i78                                           UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                      34